[No. 14794. Department One. November 14, 1918.]

ANDERSONIAN INVESTMENT COMPANY, *Appellant*, v.
JOHN PARRY JONES *et al., Respondents,*
W. E. HANSON, *State Bank Examiner*
*et al., Respondents and*
*Appellants.*[1]

MORTGAGES (8)—DEBTS SECURED — FUTURE ADVANCES — INTENT—
FAILURE TO ADVANCE. Where a mortgage was given for $25,000 to
secure advances for the construction of a building, but the mort-
gagee advanced thereon but $13,125, and it appears that $10,000
was loaned to the constructor of the building on its personal
credit and promissory note, under an agreement that such sum
and $2,000 additional be expended on the building before any
part of the $25,000 should be advanced, and the mortgagors were
not parties to such agreement, it was not the intention to make
the $10,000 an advance secured by the mortgage, and the mort-
gagee has a lien only for the sums actually advanced.

MECHANICS' LIENS (71)—PRIORITY—MORTGAGES—FOR FUTURE AD-
VANCES. Under Rem. Code, § 1132, giving a preference to mechanics'
liens over any mortgage which may attach subsequently to the
time of the commencement of the labor, an architect's lien upon a
building is superior to a mortgage for future advances, where the
mortgagee had previous notice that the architect had already com-
menced to perform labor upon the plans and specifications and
would continue as architect and superintendent of construction.

SAME (71). Where a second mortgage was subject to a mortgage
for $25,000 to secure future advances for the construction of a
building, which sum was ample to pay all liens, but only $13,125
was advanced, resulting in liens for labor and materials, equity
and good conscience requires that the liens be substituted as su-
perior liens in place of the first mortgage to the extent of
$25,000, although some of the labor was furnished after the giv-
ing of the second mortgage; since the second mortgagee had the
benefit of the construction secured by the first mortgage.

COSTS (61, 72) — ON APPEAL — SUCCESSFUL PARTIES — APPORTION-
MENT ON CROSS-APPEALS. Upon cross-appeals in a foreclosure suit,
plaintiff, unsuccessful in all respects, is entitled to no costs; a
second mortgagee, resisting plaintiff's claim, is entitled to costs
therefor, but to no costs for an unsuccessful cross-appeal against

[1]Reported in 176 Pac. 17.

other defendants; a successful lien claimant awarded superiority over all other parties is entitled to costs as part of his costs and disbursements in the foreclosure of his lien; and other lien claimants, successfully resisting plaintiff's claims, are entitled to costs as part of their foreclosure costs and disbursements; while the defendant mortgagors, having joined with the second mortgagee and incurred no costs apart from costs awarded to it, will be denied costs.

Cross-appeals from a judgment of the superior court for King county, Bell, J., entered October 27, 1917, upon findings in favor of certain defendants, in an action to foreclose a mortgage, tried to the court. Reversed on Braida's appeal; affirmed in other respects.

*Edwin H. Flick* and *Fred D. Fletcher,* for appellant Andersonian Investment Company.

*Douglas & Douglas, H. D. Folsom, Jr.,* and *A. H. Wiseman,* for appellant Braida.

*C. H. Winders, M. M. Richardson,* and *Hugh C. Todd,* for appellant Hanson.

*Van Dyke & Thomas,* for respondents John Parry Jones *et al.*

*Walter S. Fulton, Jay C. Allen,* and *Roberts, Wilson & Skeel,* for respondents Crane Company *et al.*

PARKER, J.—This action was commenced by the plaintiff, Andersonian Investment Company, in the superior court for King county, seeking foreclosure of a mortgage executed by the defendants John Parry Jones and wife upon a lot and apartment house thereon in Seattle, owned by them, purporting to secure an indebtedness of $25,000 owing by them to the plaintiff.

The foreclosure was sought upon the ground that there was default in the payment of interest on the part of Jones and wife at the time of the commence-

ment of this action, entitling the investment company
to declare the whole indebtedness due. The fore-
closure was resisted by Jones and wife, claiming that
there was no default on their part in the payment
of interest; that but $13,125 of the loan had been
advanced by the investment company, on which the
interest had been paid in full at the time of the com-
mencement of this action; and that the failure of the
investment company to advance the balance of the
$25,000 loan was in violation of its contract to ad-
vance the same from time to time to be applied in
payment of bills incurred in the construction of the
apartment house, which violation of its contract re-
sulted in enforcible mechanics' and materialmen's
liens to the extent of several thousand dollars being
filed against the property. These several lien claim-
ants assert their rights by cross-complaints, seeking
foreclosure of their several liens. The German-
American Mercantile Bank, by its cross-complaint,
seeks the foreclosure of a second mortgage upon the
same property, executed by Jones and wife to the
Central Realty Company to secure an indebtedness of
$5,000 owing by them to that company, which was
assigned to the bank. Foreclosure of that mortgage
is sought upon the ground that there had been de-
fault on the part of Jones and wife in the payment
of interest thereon which entitled the bank to declare
the whole indebtedness due. The bank also resists
foreclosure of the $25,000 mortgage by the investment
company upon the same ground as Jones and wife re-
sists that foreclosure, although it is conceded that
the investment company's mortgage is superior to
the bank's mortgage to the extent of the loan secured
thereby which has been actually advanced by the in-
vestment company. While this case was pending in
the superior court, the German-American Mercan-

tile Bank passed into the hands of the state bank examiner because of its insolvency, who now succeeds to all its rights here involved.

Trial in the superior court upon the merits resulted in findings and decree: (1) Denying to the investment company foreclosure of its mortgage upon the same ground, in substance, as such foreclosure was resisted by Jones and wife and the bank, but preserving the investment company's mortgage as a first lien superior to all others here involved to the extent of $13,-125 advanced by the investment company upon the $25,000 loan, and the sum of $1,743.28 additional advanced by the investment company to the receiver appointed in this action, for the purpose of finishing the building and putting it in rentable condition in the interest of all parties; (2) awarding foreclosure of the lien claims, all subject to the investment company's mortgage to the extent of the amount actually advanced by it upon the indebtedness to be secured thereby, as above noticed; but decreeing the liens to be superior to the bank's mortgage; (3) awarding foreclosure of the bank's mortgage as a lien inferior to all others here asserted, such foreclosure being awarded upon the ground of default in payment of interest entitling the bank to declare the whole indebtedness due.

The plaintiff investment company has appealed from the decree in so far as it is denied foreclosure of its mortgage for the full amount of $25,000 and interest as a first lien upon the property. John Braida, assignee of William J. Jones, cross-complainant, asserting a lien claim for services rendered by Jones as architect in the construction of the building, has appealed from the decree in so far as it adjudges the lien claim for such services to be inferior to that of the lien of the investment company's mortgage. The

state bank examiner, successor in interest of the German-American Mercantile Bank, has appealed from the decree in so far as it adjudges the bank's mortgage lien inferior to the liens of the laborers and materialmen, conceding that the architect's lien is superior to the bank's mortgage.

In August, 1915, and for some time prior thereto, John Parry Jones and wife were the owners of the lot in question, it being then unimproved. The Central Realty Company was then, and until near the time of the commencement of this action, engaged in promoting the construction of buildings upon unimproved property in Seattle by securing loans and entering into contracts for the construction of such buildings, looking to the receiving of commissions upon such loans and profits upon such contracts. On August 5, 1915, the realty company entered into a contract with Jones and wife looking to the construction of an apartment house upon their lot, for which it was to receive $30,000 in the form of mortgages or the proceeds thereof. It appears that preliminary plans had then been prepared for the building by W. J. Jones, an architect, at the instance of the realty company, which plans, though not then completed in detail, were, as viewed by the parties, sufficiently definite as to the nature and size of the building to be constructed to enable them to contract with reference thereto. In that contract the realty company was designated as the party of the first part, and Jones and wife were designated as parties of the second part. So far as we need here notice its provisions, it reads as follows:

"It is agreed by and between the parties hereto that, for and in consideration of the sum of $30,000 to it paid in the manner hereafter set forth, by the parties of the second part, the party of the first part agrees

to erect upon the above described property a three-story apartment house in accordance with the plans and specifications of W. J. Jones, architect, and under his supervision, the plans and preliminary specifications having been agreed upon by the parties hereto. The party of the first part hereby agrees that said sum of $30,000 shall include all expenses in connection with the erection of said apartment house including the actual cost of the building itself, all commissions for obtaining the money and all architect fees and expenses and that said building will be erected in accordance with said plans and specifications for said sum.

"Said sum of $30,000 is to be secured in the following manner: The parties of the second part are to give mortgages upon said property running to whomever the party of the first part may secure who will furnish said money. The first mortgage to bear interest at the rate of 7% per annum, to be for not less than three years, and to be for whatever amount the party of the first part can secure upon the property. The second mortgage to be for the balance of said $30,000, to bear interest at the rate of 8% per annum and to be repaid out of the rents and profits derived from the operation of said apartment house, it being understood, however, that operating expenses, including the sum of $60 per month paid to the parties of the second part for janitor services and all taxes and interest, shall be first deducted from the rentals and the balance applied upon the second mortgage.

"As soon as said plans and specifications have been prepared by the architect and approved by the city building department the party of the first part agrees to proceed diligently with the erection of said building and to complete the same in as short a time as possible, building conditions and the state of the weather permitting. The party of the first part to have the collection of all rents and the handling and operation of said building until the net income derived from such rental after deducting the regular real estate commission for collecting rents shall have liquidated the second mortgage."

There is no stipulation in this contract as to what the cost of the building should be to the realty company nor as to what its actual value should be when completed, aside from the stipulation that it should be "according to plans and preliminary specifications" agreed upon. In other words, Jones and wife were to have the completed building in consideration of the execution of the mortgages and the placing of the control and management of the building in the hands of the realty company. In pursuance of this contract, the realty company induced the investment company to agree to make a loan of $25,000 to Jones and wife to be secured by a first mortgage upon the property, the money to be advanced from time to time by the investment company to the realty company to be used in the construction of the building, as presently to be noticed.

On August 18, 1915, Jones and wife executed and delivered to the investment company a note for $25,000, payable five years from date, with provisions for its maturing upon default in payment of interest; and also executed and delivered to the investment company a first mortgage upon the property, securing the same. At the same time a contract was entered into between the investment company and the realty company and Jones and wife which, in so far as we need here notice its terms, reads as follows:

"This agreement, made this 18th day of August, 1915, between Andersonian Investment Company, as party of the first part, Central Realty Company, party of the second part, and John Parry Jones and Kate Jones, his wife, parties of the third part;

"Witnesseth: That for and in consideration of matters hereinafter recited, said parties agree with each other as follows:

"First: That the Andersonian Investment Company will and does by these presents agree to loan to parties

of the third part, their heirs or assigns, the sum of twenty-five thousand dollars ($25,000) under the terms expressed in a certain mortgage this day executed by parties of the third part, which loan is to be guaranteed, and is by these presents guaranteed by party of the second part herein, its successors and assigns, said loan to be secured by the property described in said mortgage, and now herein recited:

. . .

"It is further stipulated and agreed as a specific consideration of said loan that said Central Realty Company shall guarantee the ultimate payment of same, and that in consideration thereof, and of other matters herein recited, said Central Realty Company shall have full charge of the building to be erected upon said premises, and shall have the right during the life of said mortgage to collect all the income from said premises and pay all bills and to apply the net proceeds to the payment of the liens existent upon said property as in its judgment may seem expedient.

"It is further stipulated and agreed, however, that party of the third part, namely John Parry Jones, shall be retained as janitor of said premises as long as his services shall be satisfactory to parties of the first and second part herein at the rate of sixty dollars ($60) per month, but that third parties other than in the matter just recited shall have no further or other rights during the life of this mortgage in the premises, but that all control and direction of the policies to be pursued in the handling of said apartment house shall be left with the Central Realty Company while its present officers are in control; it being understood and agreed, however, that in the event of a transfer of control to other parties, that party of the first part herein shall first approve the right of the successors to so continue in charge of said premises during the life of the mortgage.

"It is further stipulated and agreed that said Central Realty Company in conjunction with said parties of the third part herein shall and they hereby stipulate and agree to provide for all remaining payments necessary to the proper and final completion of the

apartment house to be erected on said premises, which apartment house shall be of the reasonable value of thirty-seven thousand dollars ($37,000) when erected, and shall be in strict accordance with the plans and specifications, true copy of which are hereto attached and made part of this agreement. . . .

"It is further stipulated and agreed that the entire loan herein referred to shall be checked out through and over the signature of Central Realty Company, to be signed by the president of said corporation and countersigned by one additional officer, and that all of said funds shall be applied in and to the erection of said building, with the exception of such commissions and expenses as may be required to be paid. . . .

"The janitor to have an apartment for himself and family in the basement of the building, free of charge."

This contract, it will be noticed, continues the relationship between the realty company and Jones and wife substantially as existing under their agreement of August 5th. It contains no language obligating Jones and wife to compensate the realty company for the construction of the building, other than by the execution of the mortgages for $30,000 as originally agreed by them, though it may seem to provide for a building of greater value than was contemplated by the contract of August 5th between the realty company and Jones and wife.

On the day of the execution of the $25,000 note and mortgage and the making of the contract between the investment company, the realty company, and Jones and wife, another contract was entered into between the investment company and the realty company, Jones and wife not being parties thereto, whereby the realty company agreed with the investment company to furnish the additional sum of $12,000 towards the construction of the building. This is found in a pro-

vision of the contract relating to the manner of advancing and applying the $25,000 of the loan from time to time towards the construction of the building, and reads as follows:

"It being understood and agreed that the Central Realty Company and John Parry Jones and wife, the owners of the property herein described, have already agreed to furnish an additional fund of $12,000 necessary to the erection of said building."

While this was a binding agreement on the part of the realty company, it plainly was not so upon Jones and wife, since they were not parties to it. It would seem that its purpose was to insure the ultimate making of the $25,000 mortgage a good, marketable first mortgage by having the property of sufficient value for that purpose, the realty company being apparently sufficiently interested in the securing of the loan to induce it to enter into the contract.

A few days later, to wit, on August 23, 1915, another contract was entered into between the realty company and the investment company, Jones and wife not being parties thereto, reading as follows:

"Whereas, there has this day been deposited to the credit of the Central Realty Company Special fund in the German-American Mercantile Bank the sum of $10,000, and whereas on the 18th day of August, 1915, an agreement was entered into between the Andersonian Investment Company and the Central Realty Company and John Parry Jones relative to a loan for $25,000 which was to be made by said Andersonian Investment Company for the purpose of erecting a building upon lot two, block eight of the replat of 12th Avenue addition to the city of Seattle, and whereas said contract and agreement provided for the expenditure of $12,000 in addition to the $25,000 to be furnished by the Andersonian Investment Company, it is agreed by the parties hereto that the said sum of $10,000, together with an additional sum

of $2,000, shall be expended by the Central Realty Company, Inc., and used in the erection of said building and the carrying out of said above mentioned agreement before any part of the $25,000 is to be paid over by the Andersonian Investment Company to the Central Realty Company Special account. And the Central Realty Company shall show receipts for payments duly made in connection with said building, which payments shall only be made upon architect's certificates issued by W. J. Jones, architect, in the sum of $12,000 before said $25,000 or any part thereof is to be called for.''

At the same time and as part of the same transaction, the realty company executed and delivered to S. E. Anderson, for the investment company, a promissory note for $10,000, and that sum was then paid over to the realty company by the investment company as agreed upon.

The construction of the building was thereupon proceeded with by the realty company, and after the expenditure by it of the $12,000 thereon, the investment company paid over to the realty company upon the $25,000 loan, sums aggregating $13,125, between January and May, inclusive, 1916. This, we assume, was applied by the realty company in payment of bills incurred in the construction of the building. No other sum was ever paid by the investment company to the realty company in connection with the construction of the building, and no money whatever was paid upon the $25,000 loan or otherwise by the investment company to Jones and wife. Enforcible liens for material and labor furnished upon the building had accumulated and been filed aggregating several thousand dollars, all of which remained unpaid at the time of the commencement of this action in September, 1916. All of these lien claims could and would have been satisfied, we may safely assume, had the investment com-

pany paid over to the realty company the balance of
the $25,000 loan, instead of refusing to do so and claim-
ing that the $10,000 paid to the realty company on
August 23, 1915, was an advance upon the $25,000
loan to Jones and wife, instead of an independent
loan to the realty company.

When this action was commenced the building had
not been quite completed. The realty company being
unable to complete it, a receiver was appointed in the
action, who took charge of the building in the inter-
est of all parties and, under order of the court, com-
pleted it at a cost of $1,743.28, which sum was fur-
nished by the investment company, as already noticed.
This was done manifestly to the end that the property
could be rented and become income producing pend-
ing this litigation.

The $5,000 mortgage executed by Jones and wife to
the realty company and assigned to the bank, and now
in the hands of the state bank examiner as its suc-
cessor in interest, was executed August 19, 1915, and
concededly inferior to the $25,000 mortgage to the
extent of the moneys actually advanced upon that loan,
to wit, the $13,125 paid over by the investment com-
pany to the realty company and the $1,743.28 advanced
by the investment company to the realty company
to complete the building. It is conceded that the in-
terest upon the $5,000 mortgage is in default, giving
the owner thereof the right to declare the whole
amount due.

The main contention here made in behalf of appel-
lant investment company is that the trial court erred
in refusing to treat the $10,000, paid by it to the realty
company on August 23, 1915, as an advance on the
$25,000 loan to Jones and wife. It is plain that, if
this $10,000 was no part of the $25,000 loan, then in-
terest had been paid upon all that was due at the time

of the commencement of this action, that is, upon the portion of the loan which had then actually been advanced. On the other hand, if the $10,000 was an advance upon the $25,000 loan, then the interest which had been paid on that loan was not payment thereof in full, but there was default therein at the time of the commencement of this action, which would entitle the investment company to declare the whole amount due and maintain its action of foreclosure. This contention, in its last analysis, presents only a question of fact as to what the intentions of the realty company and the investment company were on August 23, 1915, at the time of the execution of the $10,000 note by the realty company to the investment company and the paying over by the investment company to the realty company of that sum to be used by it in the construction of the building. It may be conceded that the relation between Jones and wife and the realty company with reference to the construction of the building was then such that whatever the intention then was on the part of the realty company and the investment company as to whether this $10,000 was an advance upon the $25,000 loan or an independent loan to the realty company, was binding upon Jones and wife.

There was introduced upon the trial of this case a large amount of other evidence with a view of throwing light upon the question of the intentions of the realty company and the investment company touching this $10,000 paid over by the investment company to the realty company. We have painstakingly reviewed all of this evidence. It would be quite impracticable to analyze it in detail here, nor do we think any useful purpose would be served by so doing. We deem it sufficient to say that the several contracts above quoted from, and especially the one of Au-

gust 23, 1915, between the investment company and the realty company contemporaneously with the execution of the $10,000 note, the paying over of the $10,000 by the investment company to the realty company to be used in the construction of the building, together with the numerous sidelights thrown on the several transactions by the evidence, convinces us that the learned trial court was correct in concluding that this $10,000, paid by the investment company to the realty company, was intended to be, and was in law and in fact, but a loan by the investment company to the realty company wholly independent of the $25,000 loan of the investment company to Jones and wife. We agree with the trial court that it was made solely upon the credit of the realty company. The very language of the contract of August 23, 1915, above quoted, seems all but conclusive upon this question, and the surrounding circumstances disclosed by the evidence, it seems to us, show the trial court's conclusion correct with still greater certainty. It follows that, at the time of the commencement of this action, only $13,125 of the loan had been advanced by the investment company to the realty company on behalf of Jones and wife, and that therefore it was entitled to interest only upon the sums so advanced. Since the evidence shows that interest had been fully paid upon the sums so advanced, there was no default on the part of Jones and wife at the time of the commencement of this action. Therefore the investment company is not entitled to foreclose its mortgage by this action; though, of course, as decreed by the trial court, that does not impair the investment company's mortgage as a first lien in securing the amount actually advanced on the $25,000 loan.

It is contended in behalf of the appellant John

Braida, assignee of William J. Jones, the architect of
the building, that the trial court erred in refusing to
adjudge the lien of the architect for preparing plans
and specifications and superintending construction of
the building superior to that of the investment com-
pany's mortgage. It is argued that the architect's
lien is superior to the investment company's mortgage
because he commenced to perform labor upon the plans
and specifications some two months prior to the exe-
cution of that mortgage. The trial court found that
such work was commenced on June 4, 1915, which, it
will be noticed, was over two months prior to Au-
gust 18, the date of the investment company's mort-
gage. That this work was so commenced and prose-
cuted by the architect at the instance of the realty
company, acting for itself and as agent for Jones and
wife, is quite plain. It seems equally plain that the
preliminary plans and specifications were for this
same building, although some changes may have been
made therein in the final construction of the building.
We note that not only does the evidence support these
conclusions, but it also plainly shows that the invest-
ment company, at the time it was negotiating for the
making of the loan, and at the time it received the
mortgage, had full knowledge of the fact that the
architect, Jones, had commenced work on the plans
and specifications for the building, and that it was then
contemplated that he should continue to be the archi-
tect and superintend the construction of the build-
ing. It is conceded that the architect is entitled to
a lien for his work as such. It was squarely so held
in *Gould v. McCormick*, 75 Wash. 61, 134 Pac. 676,
Ann. Cas. 1915A 710, 47 L. R. A. (N. S.) 765, the only
question here being as to whether the architect's lien
is superior to that of the investment company's mort-

gage. Section 1132, Rem. Code, of our lien statutes, provides:

"The liens created by this chapter are preferred to any . . . mortgage . . . which may attach subsequently to the time of the commencement of the performance of the labor, or the furnishing of the materials for which the right of lien is given by this chapter . . ."

It seems quite clear to us that the learned trial court fell into error in decreeing the architect's lien, now held by Braida, to be inferior to the investment company's mortgage, and that as to this branch of the case the decree must be reversed.

Contention is made in behalf of appellant state bank examiner, successor in interest to the German-American Mercantile Bank, now owner of the $5,000 second mortgage, that the trial court erred in decreeing the labor and material liens superior to this mortgage, conceding that the architect's lien is superior because of the date of the commencement of his work being prior to the execution of the mortgage. We may assume for argument's sake, that all the labor and material, for which liens were foreclosed by the decree were not commenced to be furnished before the execution and recording of this mortgage. However, had the whole of the $25,000 loan to be secured by the first mortgage been advanced and applied as agreed upon by Jones and wife, the realty company and the investment company, these liens would not have been upon the property at all; but instead that mortgage would have been a lien upon the property superior to the $5,000 second mortgage to an amount at least as large as the amount which was actually advanced upon the loan, with the amount of the liens added. So the bank examiner, as successor in interest of the German-American Mercantile Bank, owner of the $5,000

second mortgage, is in no worse position than he would have been had the $25,000 loan been advanced as contemplated. These liens were all incurred for labor and material which worked to the benefit of the holder of this $5,000 second mortgage, and manifestly all parties, including the bank and the bank examiner, its successor in interest, understood that the $25,000 mortgage was superior to the $5,000 mortgage. The bank examiner was, of course, permitted to insist that only a part of the $25,000 had been advanced, but we do not think there can, in good conscience, be any objection to the placing of the lien claimants, in a sense, in the shoes of the investment company, and the substituting of their liens as superior liens in the place of the first lien of the $25,000 mortgage, so long as the total of such liens and the amount advanced on the $25,000 does not exceed the total amount of that loan as contemplated and secured by the first mortgage. These considerations lead us to the conclusion that, under all the circumstances of the case, equity and good conscience dictate that these liens should be held superior to this $5,000 second mortgage, and that the trial court correctly so determined.

The decree is in all things affirmed, except in so far as it adjudges the lien of the architect, Jones, which has been assigned to appellant Braida, inferior to the investment company's first mortgage, and that, as to that lien, the decree is modified so as to adjudge it superior to that mortgage. The superior court is directed to modify the decree and cause sale of the property and distribution of the proceeds thereof to be had accordingly.

This disposition of the cause upon the merits, and the different interests involved, renders it necessary that we make some directions as to the awarding of

costs in this court. The investment company will, of course, not recover any costs in this court, since it has in all respects been unsuccessful in its appeal.

The state bank examiner is awarded costs incurred by him solely as respondent in resisting the appeal of the investment company, as a part of his costs and disbursements in the foreclosure of his $5,000 second mortgage.

The state bank examiner filed a separate brief as appellant, seeking the reversal of the decree in so far as it adjudged the lien claims superior to his mortgage. Having been unsuccessful in his appeal, he, of course, cannot recover costs incurred by him as appellant.

Appellant John Braida, as assignee of William Jones, the architect, having been successful in his appeal in establishing the superiority of his lien, is awarded costs as appellant, as a part of his costs and disbursements in the foreclosure of his lien.

The lien claimants Crane Company, Schwager-Nettleton Mills and the Seattle Paint Company, have jointly filed a brief as respondents, resisting the appeal of appellant state bank examiner. These claimants are awarded costs in this court as a part of their costs and disbursements incurred in the foreclosure of their lien claims.

Respondents Jones and wife have joined with the state bank examiner in his brief in resisting the appeal of the investment company. Having incurred no costs apart from the costs awarded to the state bank examiner, they are denied recovery of costs in this court.

MAIN, C. J., MITCHELL, TOLMAN, and FULLERTON, JJ., concur.